Case number 19-1419 in the case of Dennis Black et al. versus the Pension Benefit Guaranty Corporation. Argument is not to exceed 15 minutes per side. Oh, it's right here. I'm sorry. If you'll allow me to proceed. Good morning and may it please the court. I'm Anthony Shelley here on behalf of the appellants whom I will refer to as the Delphi salaried retirees or just the retirees and I've reserved three minutes for rebuttal. Ten and a half years ago, the PBGC commenced a federal lawsuit in Michigan to terminate the Delphi salaried retirees pension plan. Fearing that the PBGC would sacrifice their plan at the behest of the Obama era auto task force, the retirees contacted the PBGC for its consent to the retirees intervention in the lawsuit. In response, the PBGC, as the evidence in this case shows, panicked that they would have to try to prove the necessity for the termination. So the PBGC immediately aborted its lawsuit and instead went a different route to terminate the plan. It simply entered an agreement with Delphi's plan administrator who couldn't have been happier to shed its pension plan resulting in the termination of the plan. Terminating the plan through a simple agreement with the plan administrator was contrary to a statutory language to the due process clause of the Constitution and is indefensible in our view on the substance. Do you think the statute affirmatively prohibits the agreement or does it not explicitly authorize the agreement? I think it affirmatively prohibits it because it allows, by stating one route for a termination, which is through a judicial decree, it inevitably leaves the rest of the statute to indicate that no others are available. And particularly, in addition, when you look at the context in which all of this arises, which is that the Congress did in Part A of 1342 state that there could be streamlined procedures for small plans, but it still had to include a court decree, and then nowhere states anywhere any kind of streamlined procedures for large. Do you think that when the statute talks about proceedings in Section A, is that only judicial proceedings or can that be any kind of proceeding? It's unclear to me. I think it's judicial proceedings. I think it's ambiguous in that sense, but I think 1342 talks about initiation of proceedings, not termination of plans, but initiation of proceedings. And my understanding has been that that means initiation in courts of proceedings. And there are broader terms for initiating a termination proceeding than there are for actually terminating the plan. There are four more open-ended reasons that the PBGC can start an investigative proceeding in a court, for instance, to determine if a plan should be terminated. And then when you get to C, they have to seek the court decree under much narrower circumstances. Let's say there's a judicial proceeding. Do you think that the parties can settle the case without litigating it to the end voluntarily? I believe you'd have to have a judicial decree adopting that. The parties could settle it. They'd have to go to court, as typically happens in a settlement, and have the court agree to the decree. Well, most settlements you don't, right? Most settlements you and I agree and somebody dismisses the case and we're done. You don't go to the court and say, are we allowed to settle? But you're saying that if they wanted to settle this case or any case under this provision, you'd have to actually go to the court and say, we want to settle, will you let us settle? If the settlement is to terminate the plan, they'd have to do it via a decree. And you'd have to have all the parties present. There are a lot of interested parties, the PBGC, the plan administrator, but the participants. The participants were not involved in the agreement in this instance, and so their rights were never protected in the instance. Did your clients have a plan that they could get their money and the hourly workers get theirs, too, if there was sufficient funds for that? Or you never got that far? Well, there are two separate plans. The hourly plan had its plan and they were topped up. They still get it. They're getting 100%. And our plan, no top-ups, and the PBGC is running the plan. The PBGC is also running the hourly plan. If you put all the money back in that you had, is there enough for both sides to get the money? Well, the only answer I can give to that is that if you took the money that constituted the assets of the salaried plan and you took all the gains that have accrued in the 10 years since, there would be more than, in our view, as our experts stated, and this was in Document RE305, Exhibit 79, there would be enough money in there to pay all the benefits, and the PBGC would probably have money left over at this point. That's, in fact, the equitable remedy we seek. What's the relief that you get in this case? Do you get the money from the government, from the PBGC? Well, we would like appropriate equitable relief as the statute defines it, and ERISA has a long history of cases from the Supreme Court as to what constitutes appropriate equitable relief. But in this case, plan assets that were taken from the plan and taken by the PBGC and now have earned billions in additional investment earnings would be returned. It's a segregated fund that could be returned, and actually what we would like is for the plan to be run with those monies, with an independent fiduciary, that the money would simply be taken from the PBGC, segregated, and … So those assets are still kept segregated as salary plan? With the old salary plan assets? The PBGC is allowed to pool all the assets together for investment purposes, but I'm quite confident that an accounting could determine of the total amount what specially belongs to the salary plan or could be accounted for for the salary plan. Simply because they commingled it doesn't mean we lose our equitable right to the return of funds that were unjustly taken from us in a constructive trust sort of fashion. We actually went through this analysis with Judge Tarnow early on when we sought a preliminary injunction to keep the funds segregated and make sure they weren't being used by the PBGC, and the PBGC agreed that we wouldn't have to do that because at the end of the day, if we did win, the PBGC would treat the funds as if they had been segregated. So that's the remedy that we would seek. We would seek the return of the assets and the earnings on them to be used for the plan, and essentially the plan would be run as a standalone entity, which is also what our experts suggested could easily happen here. What's your best case to show that you're correct in this approach? The best case would be Judge Easterbrook's decision in In re UAL Corp. in the Seventh Circuit where he talked about how the Section 1342C does only one thing. It gives the PBGC the right to go to court, to be a litigant in court as a prosecutor to seek to terminate a plan. But nobody was arguing the other side. Were they in that case? I mean, and I understand that there are a lot of cases kind of generally in this area, but only the Second Circuit has actually confronted the actual issue. Is that right? Correct. Exactly. I mean, they have cases on their side, but you would distinguish them in the same way and say, well, they didn't. Other cases just assume it can happen, the termination agreement. But I readily admit that Jones and Laughlin is the one case that addresses what does the statute say and the due process considerations. But we disagree mightily with the statutory analysis of the Second Circuit in that case, and we don't think it all holds up to a plain review in that they're implying a momentous right here to terminate a pension plan that affects thousands and thousands of people from language Congress doesn't have in there. But if it did, it would be in this mousehole of the fourth sentence of Section 13. Is it really a mousehole, though? I mean, it says if they agree to terminate. So there's agreement, and it says terminate the plan. So it's pretty clear that somebody contemplates some kind of an agreement to terminate a plan in that sentence. And it excludes, the interesting thing about that sentence, it seems to me, is it excludes if there's an agreement on, it's parallel, it seems to me. It's A, terminating plans, B, appointing trustees. If you agree to both of those things, then you aren't subject to the rest of C, which is all about adjudication. Why doesn't that just hang together? I think that's an incorrect reading, and I'd like to sort of play this out a little bit by going through. There are five sentences in the section, and the fourth one is the key one. But the first three are important to understand what the fourth one means. So the first sentence says that where the PBGC has initiated, and the statute is on addendum of our opening brief. Oh, sure. Page 11. The first sentence says that where the PBGC has initiated termination proceedings in a court or otherwise provided notice of termination, it may apply for a court decree. The second sentence provides that the trustee can intervene or the trustee itself can seek a termination decree. Sentence three then says that upon the district court granting the termination decree for which the PBGC or the trustee sought, the trustee shall then have the authority to terminate the plan. Then comes sentence four, and it says nothing about terminating a plan. What it says is it describes the powers of a trustee when the PBGC was not the one that sought the decree. In other words, it wasn't acting, it wasn't proceeding in accordance with the subsection. This is when the trustee would have been the one seeking the termination. And then that sentence simply gives the trustee certain powers and duties, assuming that the PBGC and the trustee were in agreement. But it says if the corporation and the plan administrator agree that a plan should be terminated. Should be terminated. And agree to the appointment of a trustee. So it seems to me. And the trustee has certain powers. Right, but without proceeding in accordance with the requirements of this subsection, meaning the first three sentences are not something that we need to worry about because we're not proceeding in accordance with the requirements of the subsection. But we just want to make it clear that if we have an agreement and we have an agreement to appoint a trustee, that trustee is going to have certain powers. It's the PBGC that was not acting in accordance with the first three sections. The trustee might have been. And that then leads to the situation where the PBGC and the plan administrator could agree to somehow limit the duties of the trustee, who's just been told by the court to terminate the plan. And Congress was worried there would be a conflict of interest here, that the PBGC and the plan administrator would seek to undermine the trustee who alone was seeking the termination. And they said, what you say in an agreement about a trustee can affect the duties. That's what the fourth sentence says. If, but only if, you both agree that the plan should be terminated and that you agree on this trustee. So what it is is it's dealing with really a conflict of interest between the plan administrator and the PBGC in a situation where the trustee was the one acting in accordance with the section, but the PBGC never sought the termination under C. The other point I wanted to make is about the Second Circuit case is that it has a due process component, which is entirely inconsistent with this court's decision in Hicks. Hicks is a very new decision, 2018 or 2019, which explains that the minimum of due process in every case is a pre-deprivation hearing of some sort when property rights are at issue, and that didn't happen here. So I'd like to reserve the remainder of my time. Would you have a pre-deprivation hearing? How would you operate that? It would be the court decree that the court would see. Would you tell their story or would you have it as one big block? We would go under 1342C to the lawsuit that the PBGC began but aborted. The participants would be able to come in, present their story. The PBGC could present its story, and I'm confident that had we done so, our experts' testimony, which was unrebutted and would have prevailed and the district court would have said this is not a fair deal for the participants. You're going to have to work harder, PBGC, to get them a better deal from the Treasury in this situation.  Thank you, Your Honor. Your Honors, excuse me, may it please the court. I'm John Menke, Assistant General Counsel for the Pension Benefit Guarantee Corporation, speaking on their behalf this morning. I think Judge Nelbandi and you have hit the nail on the head. Forty-five years ago when Congress enacted ERISA, 1974, Section 4042C in the exact form that you see it today was in the statute. It has remained in the statute unchanged in that period of time. During that 45-year period, Congress has substantially amended a variety of provisions of ERISA, including many of the other provisions in Section 4042, and did so because it didn't believe those statutes in their then form were accomplishing what Congress intended. In their reply brief, appellants here have essentially accused PBGC of acting as a rogue agency for 45 years, acting contrary to the intent of Congress and terminating plans by agreement between itself and the plan administrator. Early on, in this case in 2009, PBGC actually counted up all its terminations and counted up how many of those terminations had been done through agreement and how many had been terminated by court decree. What other support in the statute do you have other than that fourth sentence? The fourth sentence quite explicitly says that by agreement we can terminate the plan. It's worth noting. It seems to contemplate that it could happen, but it doesn't really authorize it, does it? Why would A, for example, authorize the summary proceedings for smaller plans, but leave out the idea that, oh, by the way, if you want to agree for another plan, you could do that? It seems odd, doesn't it? This provision about summary proceedings for small plans itself seems odd to us. PBGC has never exercised its discretion in that provision and has terminated all plans, whether they have one or two participants or 20,000 or more participants, in exactly the same way, by following the provisions in 4042C, which we find adequate for the job. The suggestion that we go willy-nilly terminating plans by agreement without thinking about it is wrong. It's a very serious thing we do when we terminate a pension plan. We appreciate the interests that are involved, both the interests of the participants, the interests of the company, the interests of the insurance fund. Yeah, but why should they take your word for it? Why don't we have a judge look at it? We are, in fact, having a judge look at it at this very moment. Did a judge agree to approve this? Oh, you mean agree to look at this termination? In fact, in this case, it did. In this case, the settlement agreement between PBGC and Delphi Corp., which led to the ultimate signing of the termination and trusteeship agreement, was brought up before the bankruptcy court in Delphi's bankruptcy proceedings in New York. The plaintiffs or appellants in this action were very actively participating in that bankruptcy proceeding, filed objections to the PBGC's agreement. The judge carefully considered it and said he – But he didn't say, hey, I approve of your decision to save the hourly plan and not the – Well, we didn't save the hourly plan. The hourly plan and all six Delphi pension plans were terminated and taken over by PBGC. You may be referring to the agreement that GM and its largest unions, particularly the United Auto Workers, reached in 1999 when Delphi was created, long before – well, not long before, but before it went into bankruptcy, at a time when it was thought to be an investment-grade and quality company. The union worked with GM in effecting that division of GM into those two parts and negotiated a collective bargaining agreement that gave it a special deal. It got GM to agree that if the Delphi hourly plan, which was the one that affected union workers, ever terminated, GM would make up any losses that the employees might lose as a consequence. Had the salaried workers wished a similar provision, I presume they could have worked with their own – since they were the executives, they could have put it in if they wanted or if they could have gotten GM to agree to it. The union was able to get GM to agree to it and continued to insist that that provision survive. That's how collective bargaining works. If you are a member of a union, you can negotiate a better deal for yourself. That's the whole idea. That's what they did. PBGC had absolutely nothing to do with that top-up whatsoever and indeed has striven to remain independent from it to this day. Was there sufficient funds there to fund both sides, both the salaried and the workers? Oh, heavens no. The salary plan, when it was terminated in 2009, had about $7 billion in assets – no, about $4 billion in assets in excess of $7 or $8 billion in liabilities. We calculated that the unfunded benefits in that plan were about $4 billion. The hourly plan is short about $2 billion, the majority of both those amounts. PBGC's net loss in this case is in the order of $5 to $6 billion. So we are – just a moment to slide over to the due process argument. We are not taking anything from these people. We are giving them $6 billion in benefits total between the two plans that they would not otherwise have received.  That is absolutely our best case, and that is the only case that explicitly – They say that this case has a Seventh Circuit – Seventh Circuit, the United Airlines case – excuse me, I'm very familiar with the United Airlines case, Your Honor. It did not address this issue at all. The United Airlines case arose in a situation where the plan administrator in that case, which is United Airlines – let me back up a second. The plan administrator was United Airlines. The case involved the United Airlines pilot's pension plan. The pilots had a collective bargaining agreement with the company that provided that their plan could not be terminated, that the company could not agree to terminate the plan, at least the company read it that way. And the company chose not to go through the complex bankruptcy procedure set forth in Section 1113 of the Bankruptcy Code to modify its collective bargaining agreement to allow it to agree to terminate. Rather, it said, if PBGC – we would like to see the plan terminated. We agree that our plans have to be terminated, because at the time United was in bankruptcy and certainly didn't have the wherewithal to maintain its pension plans. But we can't agree, therefore you have got to go to court to terminate it. We ended up before the bankruptcy court in an exceedingly long proceeding. It took a couple of years. The plan was terminated for a while, then it was unterminated, then it was terminated again. Suggests the risk of going to court at all. It created dramatic delays and confusion. Ultimately, the court concluded that PBGC had established what it needed to do using – actually, I would note, using an analysis much like this court did in the RTI case, that PBGC could terminate the United Airlines pension plan to save its insurance funds. It could look after its own business interests and terminate that plan over the objection, strident objection, of the Pilots Union, ALPA, the American – oh, goodness. Anyway, the Pilots Union. I forget what the acronym is as I stand here. I apologize, Your Honors. But PBGC was forced to go through the court proceeding. It took many months of delay to that termination, many months of confusion, but ultimately the court concluded that we had established what we needed to terminate, and that was all because the plan administrator in that case could not agree with us, could not enter into a termination and trusteeship agreement with us. United Airlines was, in fact, able to enter into such agreements with its three other very large pension plans, one representing ground. I mean, wasn't Judge Easterbrook's language, though, pretty clear about – I mean, this section is about the judicial function, and therefore he's not – it's about deference, right, and whether he should defer or not. Right, that's right. And he says this is really a judicial thing, so it really doesn't implicate agency deference. Right. So isn't that premise – isn't his premise – doesn't that really support their view? I think no, Your Honor, because he was looking at the first three sentences which were applicable in that case, were applicable to – The first three sentences of C. Of C, which were applicable in that case because, in that case, the plan administrator would not agree with PBGC. Remember who the parties are in any proceeding to terminate a plan. The two parties are the one side, the plan administrator, and the other side, PBGC. The employees are not a party. Why is that? As the Supreme Court has said time and time again, decisions – major decisions about a pension plan, whether to have one at all, whether to assume a pension plan that somebody else had, and whether to terminate a pension plan are what are called settlor functions, are business decisions by the company based on the company's assessment of its business circumstances. The company, I suppose, in assessing its business circumstances, if it wishes, can take into account the employees, but no requirement that it must do so. That is why, in this case, below, although they did not raise it on appeal, the Court rejected the argument that this termination implicated fiduciary obligations to the employees. It simply doesn't. The Supreme Court has said that time and again. You asked earlier whether there was a second ground we could say, other than just this statute, why we have authority to do this. PBGC, when it was created in Section 4003, is given the ability to defend and prosecute in any court in the land all cases that involve it. It does that independently of the Justice Department, which explains why I'm here, not a Justice Department lawyer. The courts have held, in the Allied Pilots case out of the D.C. Circuit and others, that the power to litigate necessarily includes the power to settle a case. So we have, for 45 years, we have interpreted these provisions in 4042C as a whole to effectively say that if there's a disagreement between the two parties at issue, PBGC and the plan administrator, the statute does not give the PBGC police power to simply seize the plan without any further proceeding. We must go to court and get the court's help to take over a pension plan that is being defended by its administrator. However, if the two parties to a lawsuit agree that a particular course of action ought to be, whether they do it after the suit is filed in the settlement agreement or before the suit is filed, there seems to me no point in going to court, and even a question as to whether there would be a case or controversy at that point. You didn't have a case where you were required to get a consent decree, right? I suppose. In class action settlements, we have courts review, don't we? Of course. This is not a class action. There are only two parties to this. Well, I understand it's not a class action. That's not my point. My point is that we have situations where courts do look at settlement agreements, right? Of course. We have a case in the Sixth Circuit, right? Alloy Tech or whatever that case is where that one involved a consent decree, right? A settlement, but it was a consent decree. It goes on the docket. Somebody can intervene. Somebody can complain about the settlement. I mean, that's why you have it in place, right? And were that the case, I would say that Congress could have provided for that, but it didn't. Well, let me ask you this. I apologize, Your Honor, please. No, no. Go ahead. Go ahead. It is noteworthy, I think, in this statute. And a word that the appellants here run from is that the statute says that after PBGC concludes that a plan should be terminated, it may go to court to terminate it. That language is very different from a mandatory must-get-a-court decree. That is a clear discretionary language that's been held in every court. So your view is that proceedings, instituting, quote-unquote, proceedings in Section A, includes more than just judicial proceedings? Oh, heavens, yes. There are many proceedings that are involved in terminating a pension plan, many internal to the PBGC in its practice and its regulations that it must follow before it exercises its discretion under A. It must make one of the findings. Courts have routinely held that that is an administrative adjudicative act that is challengeable under the Administrative Procedures Act. It concludes whether or not to put it in C. It requires PBGC to conclude that the plan should be terminated. All that is done through a careful and detailed administrative procedure within the agency involving an organization called the Trusteeship Working Group, which reviews closely all recommendations by PBGC staff that a plan should be terminated. Yes, those procedures. And it's also noteworthy, while we're talking about that A provision, they point to the clause that says, including the requirement for a court decree is somehow modifying the rights of the participants in that plan. Grammatically, it doesn't. There's a comma, and then, for the employer and for the employers who maintain such plans, including the requirement for a court decree. Obviously, like in C, the court decree that they're talking about there is for the protection of the company maintaining the plan, the plan administrator or sponsor. I see my time is up. I have not talked about the constitutional issue, if you would care to that. Otherwise, I would thank your honors for your time and would rest on our brace. Your honors, just a few points. First of all, I strongly disagree with Mr. Manky's assertion that this plan was woefully underfunded. And again, I'd like to point the court to the expert report. And I miscited it when I gave the site before. It's actually Record Document 308-129, Exhibit 128. And the expert notes that this plan was 85 percent funded at the time of its termination, and that there were many, many plans at the bottom of the financial crisis that were worse funded than this one. And, of course, those weren't terminated. With respect to the may language at the very beginning of subsection C that says the PBGC may seek a court decree, the reason it says that is because under A, they're supposed to initiate proceedings, but they don't have to then, after they initiate, automatically terminate a plan. If it said the PBGC shall then seek the court decree, then that would mean in every case that they initiate proceedings, they'd have to then seek the decree. And we know that's not the case because- Why would that be true? I mean, C is about adjudication. So if they've proceeded along this path, then if you really want to terminate it, you must go to court. I mean, that would be the reason. You would say, look, if this has gotten to the point where it's got to be terminated, you need a court's blessing. So you've initiated proceedings under A. And then C then says, if you've initiated proceedings under A, you may seek the court decree. And Mr. Mackey wants to say- But if what I'm saying is true, if what you're saying is true, why wouldn't it say shall? So at that point, you've decided and you want to terminate, you must, shall, whatever it is. It would be not permissive language. It would be you must go to court and get the court's blessing to do this. And it doesn't say that. Because in many instances, A is an initiation of a court proceeding to begin the termination process. But the PBGC doesn't have to finish that. And if it said shall in C, they'd have to finish it. Because part of the first sentence of 1342C is if you've initiated under A, you may seek the decree. But we know from 29 U.S.C. Section 1347 that they don't have to do this. Because this section, which involves restoration of plans, says that whenever the corporation determines that a plan which is to be terminated under Section 4042, or which is in the process of being terminated under Section 4042, should not be terminated under 4042, as a result of such circumstances as the corporation determines to be relevant, the corporation is authorized to cease any activities undertaken to terminate the plan. And so that's why the may is there. Ultimately, this case, that fourth sentence, everything turns on whether you can read into it an implied power to terminate a plan. And we say you cannot because that would be momentous. It wouldn't be hidden in that cryptic sentence. It could have been stated expressly if Congress really wanted it. They stated many other things in the statute expressly. It would undermine all the express language that is outlined in the section. And it wouldn't jibe with A, which refers to a requirement of termination decrees under C. So we'd ask that you reverse Judge Tarnum's decision and set this case back for an equitable remedy. We appreciate the argument both of you have given. We'll consider the case carefully. I probably ought to note for the record that there had been a motion in this case to close the courtroom during argument, and the panel's understanding based on the representation of the parties, or of counsel for the parties, to the clerk that there was no need to close the courtroom because there was no one extraneous to this case who would cause you concern. I just want to confirm on the record that that's the case. The excuse you see here under that is correct. We have no problem with the folks who are in this courtroom, including the appellants. Okay. All right. In that case, we may recess.